UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MELANIE R. ENGLAND,

                  Plaintiff,

-vs-                                    Case No. 6:06-CV-1738-ORL-KRS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

_____

## ORDER

      This cause came on for consideration without oral argument on the Complaint

filed by Melanie R. England, seeking review of the final decision of the Commissioner of

Social Security denying her claim for social security benefits.  Doc. No. 1.  The

Commissioner answered the Complaint and filed a certified copy of the record before the

Social Security Administration (SSA).  Doc. Nos. 8, 9.  Pursuant to the consent of the

parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).

Doc. Nos. 13, 14.

## I.     PROCEDURAL  HISTORY.

      In September 2003, England applied for disability benefits under the Federal Old

Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and

under the Supplemental Security Income for the Aged, Blind and Disabled Program

(SSI), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act).  R. 57-59,

458-60. She alleged that she became disabled on July 8, 2003. *Id.* England's

applications were denied initially and on reconsideration. R. 32, 34, 449, 451.

England requested a hearing before an administrative law judge (ALJ). R. 39. An

ALJ held a hearing on November 30, 2005. England, represented by an attorney,

testified at the hearing. R. 477-86.

After considering the testimony and the medical evidence presented, the ALJ

found that England had not engaged in substantial gainful activity since the alleged onset

date of her disability. R. 18. The ALJ concluded that the medical evidence showed that

England had bipolar disorder, a personality disorder, and disc disease with chronic low

back pain, which were severe impairments. These impairments did not meet or equal

any of the impairments listed in the applicable social security regulations (the Listings),

including Listings 12.04 and 12.08.[1] R. 20.

The ALJ found that England had the residual functional capacity (RFC) to perform

work at a medium level of exertion; specifically, she could lift 25 pounds frequently and

stand and walk for 6 hours during an 8-hour workday. R. 21. The ALJ concluded that

England's mental impairments resulted in mild limitations in her ability to perform daily

activities, and moderate limitations in concentration and social functioning. R. 20. As a

result, she could not perform complex tasks or other high cognitive functioning and could

---

[1] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

not have significant contact with other people or perform high stress-work.  She could, however, understand, carry out and remember simple instructions; use judgment; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting.  As a result, the ALJ concluded that England could perform unskilled work.  He found that this limitation did not significantly erode the occupational base for work at the medium level of exertion, citing Social Security Ruling 96-9p.  The ALJ, therefore, concluded that vocational expert testimony was not required. R. 22.

In reaching this RFC assessment, the ALJ found that England's testimony about her functional limitations was not entirely credible.  He cited the opinion of Dr. Stephen Nasser, a consulting psychologist, who found that England had the capacity to maintain a very low stress job.  Dr. Nasser also observed that England had little motivation to work, which the ALJ found diminished England's credibility.  The ALJ cited England's inconsistent testimony about being unable to commit to a regular schedule but needing to be in places that were organized.  R. 21-22.

Because England's past relevant work was semi-skilled, which exceeds her RFC, the ALJ concluded that England could not return to her past relevant work.  R. 22. Relying on the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ concluded that there would be "a number of 'unskilled' jobs at the 'medium' level that the claimant would be capable of performing . . . ."  R. 23.  Therefore, the ALJ concluded that England was not disabled.  R. 23.

England requested review of the ALJ's decision. R. 9  On October 18, 2006, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8. England timely sought review of this decision by this Court.  Doc. No. 1.

## II.    JURISDICTION.

As England has exhausted her administrative remedies, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

After a review of the complete record before the Court, I find that the facts are adequately stated in the ALJ's decision and the parties' memoranda.  Therefore, I will only summarize pertinent facts to protect England's privacy as much as possible.

England was 33 years old on the alleged onset date of her disability.  R. 479.  She had a high school education, and had attended massage therapy school.  R. 73, 479. She had worked as a registration associate and rehab technician at a hospital, and as a therapist, au pair, dispatcher, production traffic manager, and secretary.  R. 68, 77.

She left her most recent job because she was having difficulties that resulted in nervous breakdowns.  Her attendance at work was inconsistent. R. 480.

Medical records reveal that England had a disc protrusion in her lumbosacral spine with pain and parathesias.  R. 176, 183-84, 191.  In May 2004, Nicholas H. Bancks, M.D., opined after a review of England's records that due to degenerative disc disease and lumbar strain, England could lift up to 50 pounds occasionally and 25 pounds frequently, and should avoid concentrated exposure to hazards.  399-406.

From May 2002 through September 2003, England received psychological counseling from Lori Sarvis, L.C.S.W.  R. 270-86.  At Sarvis' recommendation, England sought treatment from Richard S. Faulk, M.D., a psychiatrist, in June 2002.  R. 342-43. England initially told Dr. Faulk that she was having difficulty functioning and frequently thought that she wanted to die.  Dr. Faulk's assessment was a single instance of major depression.  R. 342-43.  He treated her with medication and told her to continue therapy with Ms. Sarvis.  R. 343.  Her condition had not improved as of October 2002.  R. 339. In December 2002, England reported thoughts of carbon monoxide poisoning or overdosing on pills.  Dr. Faulk directed England to be admitted to Fair Oaks hospital.  R. 336.

The hospital reports reflect a diagnosis of severe depression with suicidal ideation.  R. 134-35.  England reported a long history of depression, for which she had been taking medication.  R. 131. Praturi Sharma, M.D., observed that England's affect was flat, her mood depressed, and her attention and concentration impaired.  Dr. Sharma's assessment was that England had recurrent major depression.  R. 132.  She was treated with medication and therapy.  R. 129-30.  At the time of discharge, Dr. Sharma rated England's global assessment of functioning (GAF) at 50.[2]

---

[2] The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (hereinafter SYNOPSIS OF PSYCHIATRY). A GAF rating between 41 and 50 reflects: "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (eg, no friends, unable to keep a job). *Id.*

Dr. Faulk's records show that while England reported feeling more stabilized after her discharge from the hospital, R. 335, her condition rapidly deteriorated.  On January 16, 2003, she reported suicidal ideations.  R. 334.  In February, she indicated that she was depressed 4 to 5 days a week, but that the depression was not so intense on good days.  However, on a bad day she continued to wish that she were dead.  R. 333.  Later in February, Dr. Faulk observed that England had less depression but increased anxiety. R. 332.  On March 4, 2003, England again reported having thoughts of suicide.  R. 331.

In April 2003, England was depressed but with episodes of high energy in which she acted overly happy.  Dr. Faulk's assessment was that England had bipolar disorder. R. 328.  As of May 6, 2003, medication had helped to reduce England's hypomania periods, but she continued to have panic attacks.  R. 326.  On May 20, 2003, England indicated that she was feeling really bad again with thoughts of committing suicide.  R. 325.  Dr. Faulk again instructed England to be hospitalized on July 10, 2003.  R. 322.

In the hospital records, Sherrie A. Bieniek, M.D., observed that England's judgment and abstract thinking were impaired.  R. 143.  Her assessment was that England suffered from bipolar disorder and depression with a current GAF score of 30.[3] *Id.*  She was treated with medication and therapy.  Dr. Bieniek indicated in the discharge summary that while England's condition had improved, her prognosis was guarded.  Her GAF score at discharge was 47.  R. 144-45.

---

[3] A GAF rating between 21 and 30 reflects: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (eg, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (eg, stays in bed all day; no job, home, or friends). SYNOPSIS OF PSYCHIATRY at 299.

Sarvis' records reflect that England's condition did not improve after her July 2003 hospitalization.  R. 270-71. Following her discharge from the hospital, England told Dr. Faulk that she was a little less panicked but still quite depressed.  R. 321.  On August 5, 2003, she continued to report thoughts of suicide that continued into September.  R. 319-20.

England was involuntarily admitted to Circles of Care, Inc. on September 22, 2003 after a suicide attempt. She was discharged on September 25, 2003.  R. 445-47.

On November 7, 2003, England told Dr. Faulk that she was better when she was busy, but she still had occasional thoughts of suicide.  R. 317.  Her condition quickly deteriorated.  She reported on December 9, 2003, that she had suicidal ideations and had gone a week without her medication due to lack of funds.  R. 316.  On January 20, 2004, she told Dr. Faulk that she was depressed most of the time with continuing thoughts of suicide.  R. 315.

In December 2003, Michael H. Zelenka, Ph.D., prepared mental functional capacity assessment forms after a review of England's records.  Dr. Zelenka opined that England had an affective disorder (12.04) and bipolar syndrome that resulted in mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence or pace with 1 or 2 episodes of decompensation each of extended duration.  He did not, however, find any of the criteria under Listing 12.04(C).  R. 287-301.  He found that England's condition would moderately limit her ability to do the following: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods;

complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and, set realistic goals or make plans independently of others.  R. 302-03.

On January 30, 2004, she sought treatment at an emergency room for low back pain after her back popped when she bent over.  R. 349.  The impression was lumbar strain.  R. 350.  She also indicated that she was having suicidal thoughts.  R. 356.

Librada Porciuncula, M.D., a psychiatrist at Circles of Care, examined England on February 17, 2004.  England continued to report feeling depressed in spite of treatment. She reported that she always had suicidal thoughts.  Dr. Porciuncula's assessment was that England had bipolar disorder with a current GAF score of 60.[4]  R. 442-44.  Dr. Porciuncula saw England again on March 15, 2004.  England denied having suicidal thoughts, and her affect was full.  Dr. Porciuncula continued to treat her with medication. R. 441.

On March 26, 2004, Stephen E. Nassar, Psy.D., examined England at the request of the Division of Vocational Rehabilitation.  England complained of chronic pain in her lower back.  R. 358.  She indicated that she was still struggling with depression.  R. 359. Dr. Nasser observed that England's mood was mildly depressed, but she denied suicidal ideation.  R. 359.  Her thought processes were logical and her insight and judgment were

---

[4] A score between 51 and 60 is defined as: "Moderate symptoms (eg, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or co-workers)." SYNOPSIS OF PSYCHIATRY at 299.

fairly good.  R.  359-60.  Dr. Nasser indicated that the MMPI-2 profile after testing was a questionable validity, which might be "a 'cry for help' or possibly an attempt to exaggerate her symptoms for secondary gain reasons."  R. 361.  Nevertheless, Dr. Nasser opined that the test results revealed the following: "idiosyncratic/odd thinking, suspiciousness, preoccupation with physical problems, general anxiety symptoms, problems with social relations, depressive symptoms, and Borderline Personality traits." *Id*.  He made provisional diagnoses of depressive disorder and anxiety disorder with borderline personality traits and tendencies.  R.  361.  He indicated that "[b]ased on the clinical interview and mental status examination, it would appear that Melanie possesses the minimum amount of emotional stability to maintain a very low stress job.  Melanie's motivation to return to work is questionable."  R. 362.

Shortly thereafter, on April 6, 2004, England was involuntarily hospitalized as a result of a suicide attempt through a drug overdose.  R. 364-66.  In the discharge summary, Jude Desormeau, M.D., opined that England had a severe major depressive disorder with a GAF score of 40 on admission.  R. 383.  After medication and therapy, England was discharged on April 14, 2004, with a GAF score of 65.[5]  R. 384.

Dr. Porciuncula examined England again on April 19, 2004.  At that time, England was tearful and depressed and her affect was blunted.  R. 440.

---

[5] A GAF rating between 61 and 70 reflects: "Some mild symptoms (eg, depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (eg, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." SYNOPSIS OF PSYCHIATRY 299.

On May 21, 2004, A. Alvarez-Mullin, M.D., prepared mental functional capacity assessments after review of England's records.  Dr. Alvarez-Mullin opined that England had an affective disorder, specifically: bipolar disorder; anxiety disorder; and a personality disorder that would result in mild limitations of activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence or pace with no episodes of decompensation.  R. 407-17.  As a result, England would be moderately limited in the following areas: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and, setting realistic goals or make plans independently of others.  R. 421-22.

On July 12, 2004, Dr. Porciuncula reported that England's affect was brighter and her insight and judgment were fair.  R. 439.  She continued to do well as of September 8, 2004.  R. 438.

On December 22, 2004, Dr. Porciuncula noted that England looked very depressed.  R. 475.

On February 4, 2005, Thanesseri S. Baskaran, M.D., a staff psychiatrist at Circles of Care prepared an assessment of England's mental functional capacity.  Dr. Baskaran opined that England had an affective disorder with depressive syndrome characterized by the following: anhedonia or pervasive loss of interest in almost all activities; appetite

disturbance with change in weight; sleep disturbance; psychomotor retardation; decreased energy; and difficulty concentrating or thinking.  She also had a personality disorder with intense and unstable interpersonal relationships and impulsive and damaging behavior.  R. 425-32.  Dr. Baskaran opined that England would have mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace and four or more episodes of decompensation, each of extended duration.  He found that England had a complete inability to function independently outside the area of her home.  R. 425-36.  Dr. Baskaran explained his assessment as follows:

> Ms. England has a long history of recurring mood
> disturbance.  Depression that is severe with suicidal attempts
> dominate the clinical picture.  The underlying unstable
> personality structure renders it even more difficult [to] sustain
> mood stability.  She will require long term treatment with
> mood stabilizers and antidepressants.

R. 437.

Parwati Maddali, M.D., began treating England for her mental problems on May 5, 2005.  R. 464.  Dr. Maddali noted in July 2005 that England's insight and concentration/attention were poor and her affect was blunt.  R. 463.  In August 2005, England reported vague thoughts of suicide.  R. 462.  Her depression had not improved as of October 25, 2005.  R. 461.

Meanwhile, England continued with her treatment at Circles of Care.  R. 470-76. An ARNP observed on August 25, 2005, that England's mood and affect were somewhat flat.  England reported that she always felt mildly to moderately depressed with some anxiety despite medication.  R. 470.

At the ALJ's hearing, England testified that she had continual back pain, and that at least once a month her back "snaps out" when bending over to pick something up.  R. 484.  With respect to her mental condition, she testified that on bad days she could not get out of bed even to brush her teeth or take a shower.  If she did get up, she was essentially nonfunctional throughout the day.  R. 481. Her roommate would force her to eat.  R.  482.  On good days she might run a few errands or ride with her roommate in a car and do a few things.  *Id*.  She would, however, never go into a store alone due to anxiety.  *Id*.  She continued to have thoughts of suicide, and on bad days she would begin planning to commit suicide.  R. 483.

England believed that she could possibly handle a place that was organized and calm for about 2 hours.   When she did go out, it was for no more than a couple of hours, after which she had to rest for the remainder of the day, and needed 2 to 3 days to recover.  R. 482-83. She estimated that she had 4 to 5 bad days each week.  R. 483. She had previously played piano at a church, but she could not do so consistently due to the stress.  R. 484.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A) 1382c(a)(3)(A)].  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI,

the claimant also must show that he or she became disabled before his or her insured

status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1);

*Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that

must be followed in determining whether a claimant is entitled to benefits.  In sum, an

ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above

questions leads to either the next question, or, on steps three and five, to a finding of

disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v.*

*Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore

entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274,

1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden

temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence

that there is other work available in significant numbers in the national economy that the

claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly

applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.     ANALYSIS.

England asserts three grounds supporting reversal.  First, she contends that the ALJ erred in concluding that her condition did not meet or equal Listings 12.04 or 12.08.  Second, she asserts that the ALJ did not weigh and consider the opinion of Dr. Baskaran.  Finally, England argues that the ALJ erred by relying on the Grids rather than obtaining testimony from a vocational expert at step five of the sequential evaluation process.  These are the only issues I will address.[6]

*A.      Listings 12.04 and 12.08.*

The listings for mental disorders are arranged in diagnostic categories.  Listing 12.04 addresses affective disorders.  Listing 12.08 addresses personality disorders.

Listing 12.04 reads, in pertinent part, as follows:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

> A.   Medically documented persistence, either continuous or intermittent, of one of the following:

---

[6]  The parties were advised that issues not specifically raised would be waived. Doc. No. 10 at 2.

1. Depressive syndrome characterized by at least four of the following:

    a.    Anhedonia or pervasive loss of interest in almost all activities; or

    b.    Appetite disturbance with change in weight; or

    c.    Sleep disturbance; or

    d.    Psychomotor agitation or retardation; or

    e.    Decreased energy; or

    f.    Feelings of guilt or worthlessness; or

    g.    Difficulty concentrating or thinking; or

    h.    Thoughts of suicide; or

    i.    Hallucinations, delusions, or paranoid thinking;

or . . . .

3.    Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.    Resulting in at least two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Deficiencies of concentration, persistence or pace resulting  in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4.    Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to

withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

Listing 12.08 reads, in pertinent part, as follows:

Personality Disorders: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress.  Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A.    Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

1.    Seclusiveness of autistic thinking; or

2.    Pathologically inappropriate suspiciousness or hostility; or

3.    Oddities of thought, perception, speech and behavior; or

4.    Persistent disturbances of mood or affect; or

5.    Pathological dependence, passivity, or aggressivity; or

6.    Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B.    Resulting in three of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4.    Repeated episodes of deterioration or decompensation in

> work or work-like settings which cause the individual to
> withdraw from that situation or to experience exacerbation of
> signs and symptoms (which may include deterioration of
> adaptive behaviors).

As used in these listings, the term marked means more than moderate but less than extreme.  20 C.F.R. Pt. 220, App. 1 § 12.00(C).

The ALJ found that England had bipolar disorder and a personality disorder. However, no treating, consulting or reviewing physician who opined about England's mental RFC found that she met the criteria necessary under Listing 12.04(B) or 12.08(B). Therefore, the ALJ did not err in finding that England's condition did not meet or equal the listings.

B.    *Opinion of Dr. Baskaran*.

England argues that Dr. Baskaran is a treating psychiatrist whose opinion regarding her mental functional capacity was entitled to great weight.  The Commissioner responds that while Dr. Baskaran was a staff psychiatrist at Circles of Care, where England was treated, there is no evidence in the record to show that Dr. Baskaran personally treated or examined England.  Review of all of the Circles of Care records before the Court establishes that the Commissioner is correct.

Nevertheless, SSA regulations provide that the opinions of nonexamining professionals are opinion evidence that the ALJ must consider in making a disability determination.  *See, e.g.,* 20 C.F.R. § 404.1527(f).   While the ALJ referenced the Circles of Care records by exhibit number, he did not expressly acknowledge Dr. Baskaran's RFC assessment.  Accordingly, because the case must be remanded for the reasons discussed *infra,* on remand the Commissioner shall consider Dr. Baskaran's

RFC assessment in determining whether England is disabled.  If Dr. Baskaran did treat or examine England, it would be prudent for England to present records of this treatment or examination to the Commissioner in the proceedings on remand.

> C.    *Exclusive Reliance on the Grids at Step Five.*

Before the Grids were promulgated in 1979, the preferred method of determining whether there was work available that a social security claimant could perform was through the testimony of a vocational expert (VE). *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir. 1981). After the United States Supreme Court approved use of the Grids in appropriate cases, *see Heckler v. Campbell*, 461 U.S. 458 (1983), three-judge panels in the Eleventh Circuit began to address whether the Grids could be relied upon at step five of the sequential evaluation process when the claimant had nonexertional impairments that limited her work skills.

The law that developed in this circuit requires that the ALJ initially determine whether the claimant's alleged nonexertional impairments limit the ability to work; if they do not, then exclusive reliance on the Grids at step five of the evaluation process is appropriate. *See Reeves v. Heckler*, 734 F.2d 519, 524 (11th Cir. 1984)(citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981)); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir. 1982)(remanding for consideration whether a claimant's nonexertional impairments significantly limited his basic work skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*, 461 U.S. 952 (1983), *adhered to on remand, Broz v. Schweiker*, 711 F.2d 957 (11th Cir.), *modified in other respects*, 721 F.2d 1292 (11th Cir. 1983). However, if the ALJ finds that the claimant's nonexertional impairments significantly limit the claimant's basic work skills, otherwise

stated as precluding the wide range of work at a given exertional level, then exclusive

reliance on the Grids is not permitted. *See Phillips v. Barnhart*, 357 F.3d 1232, 1242

(11th Cir. 2004) (citing *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)). Rather,

the ALJ must turn to VE testimony regarding the specific jobs that the claimant can

perform in light of the claimant's functional capacity. *See id.* at 1243; *Welch v. Bowen*,

854 F.2d 436, 439-40 (11th Cir. 1988); *Gibson v. Heckler*, 762 F.2d 1516, 1521-22 (11th

Cir. 1985).

    The ALJ's decision that nonexertional impairments do not significantly limit basic

work skills (that is, do not preclude a wide range work at a given exertional level) must be

supported by substantial evidence in the record. For example, in *Allen v. Sullivan*, 880

F.2d 1200, 1202 (11th Cir. 1989), the ALJ found that the claimant had nonexertional

impairments arising from borderline intellectual functioning and a dysthymic disorder that

precluded her from performing complex tasks and working under extraordinary stress.

The ALJ concluded that these nonexertional limitations only slightly diminished the

claimant's capacity to perform light work and relied upon the Grids to conclude that there

was work available that the claimant could perform. The Eleventh Circuit reversed the

decision, holding that use of the Grids was inappropriate. The Court explained as

follows: "Absent testimony from a vocational expert, the ALJ's conclusion that appellant's

mental limitations do not significantly compromise her basic work skills or are not severe

enough to preclude her from performing a wide range of light work is not supported by

substantial evidence." *Id.* at 1202.

    Similarly, in *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992), the ALJ found that

the claimant had a seizure disorder that resulted in a nonexertional impairment limiting

his ability to work around unprotected heights or hazardous machinery. The ALJ concluded that these nonexertional limitations did not reduce the range of light work available to the claimant. The court reversed this decision, emphasizing that "'it is only when the claimant can clearly do unlimited types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy." *Id.* at 839 (quoting *Allen v. Sullivan,* 880 F.2d 1200, 1202 (11th Cir. 1989), and *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. Unit A March 1981)).

In the present case, the ALJ acknowledged that due her nonexertional mental impairments, England could not perform the full range of work at the medium level of exertion.  R. 23.  Because he found that England could perform unskilled work, the ALJ concluded that "the occupational base is not significantly eroded and vocational testimony is not required."  R. 22.  The only evidence he cited in support of this conclusion is Social Security Ruling 96-9p.

Ruling 96-9p does not provide evidentiary support for the ALJ's conclusion regarding the erosion of the occupational base of work at the medium level of exertion. Rather, Ruling 96-9p addresses the implications of an RFC to perform less than a full range of sedentary work.

Furthermore, I have not found any Eleventh Circuit decision in which the court approved reliance on a Social Security Ruling, without other evidence, to support the conclusion that a claimant could perform a wide range of work despite nonexertional impairments. Under the law discussed above, the rule in this circuit appears to be that when the ALJ finds that nonexertional functional limitations exist, VE testimony is

necessary to support an ALJ's conclusion that those nonexertional impairments do not significantly limit basic work skills. *See, e.g.*, *Marbury*, 957 F.2d at 839.

England requests that the Court remand this case for an award of benefits.  A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt."  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).

In this case, the Commissioner has not yet properly evaluated England's mental RFC through the use of vocational expert testimony at step five of the sequential analysis.  Accordingly, remand is required to permit the Commissioner to obtain vocational expert testimony to determine whether England's nonexertional limitations, as determined after proper assessment of her testimony and the medical evidence as a whole, significantly limits her ability to perform work at the medium level of exertion. If it does, then exclusive reliance on the Grids is improper.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the

Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42

U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a

judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 28th day of March, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE